IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GOS OPERATOR, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 12-0035-WS-N |
| | ) |
| KATHLEEN SEBELIUS, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This newly-filed action comes before the Court on plaintiff's Motion for Hearing and Issuance of Temporary Restraining Order (doc. 4).[1]

**I.    Background.**

    *A.    Relevant Factual Allegations.*[2]

Plaintiff GOS Operator, LLC ("GOS") is the operator of Gordon Oaks Healthcare Center ("Gordon Oaks"), a skilled nursing facility located in Mobile, Alabama. Gordon Oaks presently

---

[1] Preliminary review of the court file reveals that lists of resident names (with codes allowing the narrative description of particular observations concerning particular residents to be traced back to each named resident) appear in several exhibits that were electronically filed in this matter. For example, there are unredacted "Resident Identifier Lists" in Exhibits K1, K2, K3, L1, L2 and L3. This is improper, given the privacy interests involved and the redaction requirements of Rule 5.2(a), Fed.R.Civ.P., and Standing Order 30. To protect the sensitive information of third parties, the Clerk of Court has temporarily **sealed** all exhibits to the Complaint. Plaintiff is **ordered** to locate and redact all patient names from its exhibits, and to file substitute redacted exhibits on or before **January 23, 2012**, at which time those exhibits to the Complaint not containing resident names will be unsealed. If plaintiff wishes to substitute other exhibits (as it has informed the Clerk's Office), it may file an appropriate motion.

[2] These facts are drawn from the well-pleaded allegations set forth in the Verified Complaint, as well as from the facts set forth in the Motion and exhibits. To be clear, the Court is making no conclusive findings of fact, but is simply reviewing the facts as alleged by plaintiff to evaluate whether it has made the requisite showing under Rule 65 for issuance of a TRO. This caveat is necessitated not only by the limited time afforded the Court for reviewing the more than 1,300 pages of materials submitted by plaintiff, but by defendants' lack of any meaningful opportunity to be heard because of the urgent time constraints involved.

houses some 57 residents at its skilled nursing and nursing facilities, some 22 of whom are on Medicaid or Medicaid Hospice.  (MacRae Decl. (doc. 1, Exh. A), ¶ 4.)  An additional 8 residents are Medicare "A" recipients.  The campus on which the Gordon Oaks skilled nursing facilities are located also includes other facilities, including 88 independent apartment units, and 198 assisted living and specialty care assisted living beds, with a total present census of 162 residents and 157 employees.  (Feuer Decl. (doc. 1, Exh. B), ¶ 4.)

At present, Gordon Oaks participates in the Medicare program pursuant to a provider agreement (the "Provider Agreement") with the U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS").  Gordon Oaks also participates in the Medicaid program pursuant to a provider agreement with the Alabama Medicaid Agency.[3]  This lawsuit and plaintiff's Motion for Temporary Restraining Order arise from CMS's stated intention to terminate Gordon Oaks' Provider Agreement effective January 21, 2012.

As a participant in the Medicare and Medicaid programs, Gordon Oaks is subject to periodic on-site inspections, called "surveys," by regulators pursuant to 42 U.S.C. §§ 1395i-3(g) and 1396r(g).  The purpose of such surveys is to evaluate whether the facility comports with federal certification requirements, so as to remain eligible to participate in the Medicare and Medicaid programs.  The Secretary of Health and Human Services (the "Secretary") contracts with the Alabama Department of Public Health ("ADPH") to perform these surveys in Alabama.  *See* 42 U.S.C. § 1395aa, 42 C.F.R. §§ 4488-10 – 488.28.

Beginning at least as early as July 21, 2011, ADPH conducted a series of surveys at Gordon Oaks that culminated in this litigation.  Surveys completed on July 21, 2011, September 9, 2011, and October 31, 2011 resulted in reports of escalating "deficiencies," or areas in which Gordon Oaks was found not to satisfy federal participation requirements.  (Doc. 1, Exhs. D, E, and G.)  The July 21 survey found Gordon Oaks not to be in substantial compliance with program requirements, and the revisit survey conducted on September 9 found continued non-

---

[3] A condition of Gordon Oaks' participation in the Medicaid program and maintenance of its Medicaid provider agreement is that Gordon Oaks "[p]ossess certification for Medicare Title XVIII."  (Doc. 1, Exh. C, § 26.1.)  The Court understands the practical import of this prerequisite to be that if Gordon Oaks loses its Medicare Provider Agreement, it will lose its corresponding Medicaid provider agreement.  In other words, if CMS does not allow Gordon Oaks to participate in the Medicare program, then Gordon Oaks cannot participate in the Medicaid program either.

compliance. The number and severity of the reported deficiencies skyrocketed with the October 31, 2011 survey identifying at least 20 deficiencies, of which 9 were classified as representing "immediate jeopardy" to residents' health and safety. (Doc. 1, Exh. G.)[4] At least as early as November 10, 2011, ADPH recommended to CMS that Gordon Oaks' Provider Agreement be terminated. (Doc. 1, Exh. G1.) On November 15, 2011, CMS notified Gordon Oaks that the Provider Agreement "will be terminated on November 23, 2011 … if the immediate jeopardy to resident's health and safety is not removed by that date." (Doc. 1, Exh. H, at 3.) Over the ensuing weeks, Gordon Oaks worked to formulate a suitable plan of correction, so as to avoid termination of the Provider Agreement. On December 2, 2011, ADPH notified Gordon Oaks that revisit surveys performed between November 18, 2011 and November 20, 2011 had confirmed that "the jeopardy tags cited during the October 31, 2011 surveys were abated," but that "[y]our facility remains out of substantial compliance." (Doc. 1, Exh. L1, at 1.)[5] The December 2 letter notified Gordon Oaks that ADPH was recommending "[t]ermination of your provider agreement effective January 21, 2012, unless you achieve substantial compliance before that date." (*Id.* at 2.)

On December 7, 2011, CMS reminded Gordon Oaks in writing that it must "be in substantial compliance with each of the requirements for long term care facilities … in order to qualify to participate as a skilled nursing facility in the Medicare program and as a nursing facility in the Medicaid program." (Doc. 1, Exh. M.) The December 7 letter then recounted that Gordon Oaks had been out of substantial compliance with program requirements since July 21, 2011 and that, while the corrective action taken in November had "removed the immediate jeopardy conditions," Gordon Oaks "remained out of substantial compliance with the program requirements." (*Id.*) The letter further explained to Gordon Oaks that "the enforcement cycle

---

[4] "Immediate jeopardy" is defined in the applicable federal regulations as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

[5] "Substantial compliance" is defined in the applicable federal regulations as "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

began with the July 21, 2011, abbreviated survey." (*Id.*)  On that basis, CMS notified Gordon Oaks in the December 7 letter that "[y]our Medicare provider agreement will be terminated on January 21, 2012, in accordance with 42 CFR 489.53, if your facility remains out of substantial compliance on that date." (*Id.*)

ADPH performed another revisit survey at Gordon Oaks from January 4 – 8, 2012. Given the ultimatum in the CMS correspondence dated December 7, 2011, the results of that revisit survey were critically important to the survival of plaintiff's Provider Agreement.  A letter from ADPH dated January 18, 2012 notified Gordon Oaks that "[i]t was determined during this survey that your facility remains out of substantial compliance." (Doc. 1, Exh. R.)  The January 18 letter set forth ADPH's recommendation that CMS proceed to terminate the Provider Agreement effective January 21, 2012.  The survey results appended to that letter showed that ADPH had identified two deficiencies, to both of which it assigned a scope and severity rating of "E," meaning "no actual harm with a potential for more than minimal harm that is not immediate jeopardy." (Doc. 1, Exh. N at 7410B2.)[6]  Because "substantial compliance" requires no deficiencies posing a greater risk than "the potential for causing minimal harm," these level "E" findings (meaning deficiencies "with a potential for more than minimal harm") necessarily imply that plaintiff is not in substantial compliance with program requirements.  On that basis, CMS appears poised to terminate Gordon Oaks' Provider Agreement on January 21, 2012.

Gordon Oaks first became aware of ADPH's conclusions from this most recent survey during an exit interview on January 8, 2012.  This prompted a flurry of activity by Gordon Oaks. On January 10, 2012, Gordon Oaks sent ADPH a lengthy letter and numerous exhibits setting forth its position that the observed violations in the January 2012 revisit survey either were not deficiencies at all, or were deficiencies that posed no greater risk than "the potential for causing

---

[6] The detailed report accompanying the January 18 letter identifies the following deficiencies: (i) "the facility failed to follow the plan of care by not providing planned nutritional supplements," in that three of five observed residents who were ordered to receive such supplements did not; and (ii) "the facility failed to provide ordered and/or recommended nutritional supplements to residents who have or who are at risk for weight loss." (Doc. 1, Exh. R.)  The "nutritional supplements" in question appear to consist of "health shakes," otherwise known as "house shakes" or "mighty shakes."  The report recited specific observations that shakes were not being provided, and specified that Gordon Oaks had previously been cited for this same deficiency in surveys taking place in January 2009 and September 2010.

minimal harm," such that the facility should have been deemed in substantial compliance with program requirements at that time. (Doc. 1, Exh. S.)  And on January 13, 2012, Gordon Oaks (by and through counsel) formally initiated an administrative appeal of CMS's determinations as set forth in its November 2011 and December 2011 correspondence, wherein CMS found Gordon Oaks not to be in substantial compliance with program requirements. (Doc. 1, Exh. T.)

Notwithstanding Gordon Oaks' invocation of the administrative appeal machinery 7 days ago, CMS apparently intends to terminate the Provider Agreement (and the Alabama Medicaid Agency intends to follow suit as to Gordon Oaks' Medicaid provider agreement) effective January 21, 2012.  Gordon Oaks filed this lawsuit on the afternoon of January 19, 2012, seeking emergency injunctive relief to block such terminations.  Named defendants are Kathleen Sibelius, Secretary of the U.S. Department of Health and Human Services; Marilyn Tavenner, Acting Administrator of CMS; and R. Bob Mullins, Kr., Alabama Medicaid Commissioner, all in their official capacities.

Significantly, the Complaint does not ask this Court to review or overturn defendants' substantive determination that Gordon Oaks was not in substantial compliance with program requirements.  Plaintiff is not asking this Court to take over the administrative review process, to jettison administrative review in favor of judicial review, or to award any damages for harm caused by defendants' decisions.  Instead, on its face, the Complaint "seeks only to preserve the status quo pending the outcome of the administrative hearing" by enjoining defendants from terminating Gordon Oaks' provider agreements "until its challenges to the Defendants' actions have been heard and decided by an administrative law judge of the Departmental Appeals Board of Defendant HHS." (Doc. 1, ¶ 6.)  On that basis, the Complaint alleges causes of action for violation of plaintiff's procedural due process rights (failure to provide pre-termination administrative hearing), violation of substantive due process (arbitrary and capricious termination of provider agreements), and *ultra vires* (Secretary exceeding statutory authority by terminating provider agreement without any "immediate jeopardy" deficiencies and without awaiting conclusion of administrative hearing process).

### B.     *Procedural Posture.*

As noted, this action was filed just one full business day before the contemplated termination of the Medicare and Medicaid provider agreements was to occur.[7] That leaves precious little time for briefing, hearing or thoughtful consideration of any kind. Yet this is not an *ex parte* motion. Plaintiff's counsel has asserted that defendants were notified that the Complaint and Motion for Temporary Restraining Order were being filed on January 19, 2012; and counsel for the Secretary and CMS contacted the undersigned's staff just before the close of business on January 19, at which time they were informed that the Complaint and Motion for TRO had, in fact, been filed. As such, the special requirements of Rule 65(b)(1), Fed.R.Civ.P., for issuance of a TRO without notice to adverse parties are not in play here.

Upon careful review of plaintiff's Complaint, Motion, Brief, and as thorough a review of exhibits as time would allow, the Court is of the opinion that it has sufficient information at this time to rule on the Motion for Temporary Restraining Order. Moreover, convening a hasty, last-minute oral argument to hear from plaintiffs' counsel and any of defendants' counsel who could appear (and be prepared) on such short notice would not likely be helpful in clarifying the issues presented, at least for the limited purpose of resolving the Motion for TRO.[8] The Court will, however, require briefing and (if necessary to resolve credibility disputes) conduct a hearing before deciding plaintiff's request to convert the TRO into a preliminary injunction.

---

[7]     The Court has no reason to challenge the timing of Gordon Oaks' filing as a strategic ploy or intentional gambit to wait until the eleventh hour to foreclose defendants from having a meaningful opportunity to be heard. After all, plaintiff learned of the results of the latest ADPH survey just 11 days before filing its Complaint, and did not receive written notice of same until the day it filed the Complaint. Until receiving that written notice, Gordon Oaks could reasonably have held out hope that defendants would not go forward with the termination.

[8]     Such a circumstance is regrettable, and the Court does not proceed in this fashion lightly. The unfortunate reality is that, through no apparent fault of anyone, this Motion for TRO was filed with negligible time for judicial review, much less for opposing counsel to get up to speed and prepare in any meaningful way for an impromptu hearing. Under the circumstances, and in the absence of any indication of immediate harm to defendants or residents, the Court finds that the more prudent approach is to consider plaintiff's TRO materials as presented, while reserving for defendant a full and fair opportunity to be heard as to the request for preliminary injunction.

**II.     Analysis.**

To be eligible for a temporary restraining order or preliminary injunctive relief under Rule 65, a movant must establish each of the following elements:  (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.  *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).  Preliminary injunctive relief "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  Each of those factors will be addressed separately.

   *A.     Irreparable Harm.*

The Eleventh Circuit has emphasized that "[a] showing of irreparable injury is the *sine qua non* of injunctive relief" and that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Siegel*, 234 F.3d at 1176 (citations omitted).  Indeed, it has been observed that the very "purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  *United States v. State of Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986).

In this case, the harm to Gordon Oaks that will result in the absence of a TRO is both irreparable and potentially catastrophic.[9]  Unless an injunction issues, CMS will terminate Gordon Oaks' Provider Agreement on January 21, 2012.  The immediate effect will be that Gordon Oaks is no longer eligible to participate in Medicare and Medicaid.  This development threatens the very survival of plaintiff's business, and perhaps assures its failure.  As an initial

---

[9] In addressing the "irreparable harm" factor, plaintiff devotes considerable attention to allegations of irreparable harm to the residents of Gordon Oaks.  Potential harm to third parties is not properly considered under this element.  *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298 at 1307 (11th Cir. 2010) (describing this factor as "the movant will suffer irreparable harm in the absence of an injunction").  The Court will address third-party interests in the context of the fourth Rule 65 factor, which is that "an injunction would not disserve the public interest."  *Id.*

matter, plaintiff would be forced to transfer its 22 Medicaid residents and 8 Medicare "A" residents to other facilities because it would no longer be compensated to provide room, board and nursing services to them.  Moreover, under GOS's lease for the building where it operates Gordon Oaks, termination of its Medicare and Medicaid provider agreements "will constitute a catastrophic event of default … which would allow the lessor to terminate the lease within 30 days." (Feuer Decl., ¶ 3.)  Termination of the lease would require all 162 residents at the Gordon Oaks campus to be transferred elsewhere, and all 157 employees at that location to be laid off. (*Id.*, ¶ 4.)[10]  In plaintiff's view, this sequence of events would lead "GOS to cease operations, go out of business, lose revenues and residents that could not be recovered, and lose all of the goodwill associated with operation of its business." (*Id.*, ¶ 5.)  This showing extends far beyond mere economic harm, and is therefore adequate to establish irreparable harm for Rule 65 purposes.  *See Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies.") (citation omitted).[11]

### B.  *Substantial Likelihood of Success on the Merits.*

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *United States v. Alabama*, 2011 WL 4863957, *5 (11th Cir. Oct. 14, 2011) (citation omitted).  Plaintiff identifies four different grounds for its contention that it has a substantial likelihood of success on the merits.  The Court need only consider one, to-wit: that the absence of any pre-termination administrative hearing will violate plaintiff's procedural due process rights.[12]

---

[10] Even without termination of the lease, plaintiff's position is that "termination of the Medicare and Medicaid provider agreements will … make overall operations of GOS non-viable." (Doc. 1, ¶ 76.)  This allegation suggests that plaintiff is dependent on Medicare and Medicaid revenues for the overall financial success of its business, and that without such income sources it will be unable to continue operations even as to non-Medicare, non-Medicaid residents.

[11] *Cf. United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir. 1983) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("economic losses alone do not justify a preliminary injunction").

[12] The Court notes in passing that one of plaintiff's other arguments as to this element is that the Secretary would exceed its statutory authority by terminating the Provider (Continued)

As noted *supra*, plaintiff has requested an administrative hearing to challenge CMS's determination that Gordon Oaks remained out of substantial compliance with program requirements in late 2011. This hearing will presumably also encompass the January 2012 revisit survey, and plaintiff's contentions that the cited deficiencies either did not exist or were so minor as to pose no greater risk than the potential for causing minimal harm, such that Gordon Oaks was in substantial compliance at that time. The problem is that no administrative hearing will occur before the termination of Gordon Oaks' Provider Agreement. Given the parade of horribles that plaintiff shows is substantially certain to be triggered by such termination, by the time any administrative hearing happens, it will be too late to put Humpty Dumpty back together again. Gordon Oaks will be shut down, its business destroyed, its residents uprooted and scattered to the four winds, and its operator likely in bankruptcy. To afford plaintiff an administrative hearing only after these devastating events have already occurred would be a futile, empty, hollow exercise.[13] At this stage, the Court finds, plaintiff has made a sufficient

---

Agreement based on a finding of "no substantial compliance," as opposed to "immediate jeopardy." This argument hinges on a statute that authorizes the Secretary, where a facility's deficiencies "immediately jeopardize the health or safety of its residents," to "terminate the facility's participation." 42 U.S.C. § 1395i-3(i)(2)(A)(i). But that same statute provides that "[n]othing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies." 42 U.S.C. § 1395i-3(i)(2)(A). And the Secretary's own regulations, under which it is operating here, provide that "CMS terminates the provider agreement … if the facility is not in substantial compliance within 6 months of the last day of the survey." 42 C.F.R. § 488.412(d). There is authority, which plaintiff does not acknowledge in its filings, relying on these provisions to find that the Secretary is indeed empowered to terminate a provider agreement for want of "substantial compliance" at the end of a six-month survey cycle. *See, e.g., Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp.2d 1, 9-10 (D.D.C. 1999) (finding no likelihood of success on the merits where plaintiff argued that Secretary lacked authority to terminate absent finding of immediate jeopardy). There is also contrary authority, which plaintiff has presented via string cite. *See, e.g., Claridge House, Inc. v. U.S. Dep't of Health and Human Services*, 795 F. Supp. 1393, 1404 (S.D. Ohio 1991). Without more in-depth treatment of these competing authorities and analysis of the underlying provisions, the Court cannot find at this time that plaintiff has met its burden of showing a substantial likelihood of success on its theory that the Secretary lacks authority to terminate the Provider Agreement for lack of substantial compliance (as opposed to an immediate jeopardy finding).

[13]   Although plaintiff does not present any citations to support its position on this point, there is authority for the proposition that "[h]ealth care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs." (Continued)

showing of a likelihood of success to warrant entry of a TRO to preserve the status quo pending briefing by both sides on the viability of a procedural due process claim predicated on a Medicare/Medicaid provider's asserted right to an administrative hearing before its provider agreements are terminated.[14]

### C. Balance of Harms / Public Interest.

With respect to the balance of harms, there is no indication that defendants will be harmed in any respect by the issuance of a TRO that temporarily preserves the status quo by allowing Gordon Oaks to retain its provider agreements pending briefing on the motion for preliminary injunction. A two-week extension of a termination deadline that appears to have been arbitrarily set in the first place (albeit in a manner that corresponds with the end of the six-month survey cycle) will not harm defendants. By contrast, as stated above, the harm to plaintiff

---

*Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp.2d 1, 10 (D.D.C. 1999) (citing *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137, 1144-45 (2nd Cir. 1986)); *see generally Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990) ("Where primary beneficiaries of federal programs depend upon providers like nursing homes … for their benefits, and where the statutory program plan contains extensive discussion of certification or eligibility requirements and procedures for granting or revoking certification or eligibility … it is difficult to conclude that there are no 'rules or mutually explicit understandings' supporting the providers' claims of entitlement to certification or eligibility status.").

[14] The Court is aware of authority holding that "a pre-termination hearing is not required where the Secretary determines that a situation of 'immediate jeopardy' exists." *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1086 (7th Cir. 1982). But there is no "immediate jeopardy" finding here and no reason to think that the health and safety of Medicare and Medicaid residents will be in jeopardy during the pendency of any pre-termination hearing. Nonetheless, the Court expects both sides' briefs to come forward with authority supporting their respective positions as to (i) the presence or absence of a property interest in continued participation in the Medicare/Medicaid programs; and (ii) the presence or absence of a constitutional right to pre-termination hearing to protect that interest (or whether other forms of process, such as the surveys themselves, are sufficient under the Fifth Amendment, *see Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 365 (6th Cir. 2000) (in Medicare context, "[a] termination decision is well-documented and typically is based on survey reports from unbiased health professionals who apply well-defined criteria developed through the administrative process; the provider has the opportunity to submit written material in response to the survey findings so that a hearing likely is not necessary for the provider to present its position")).

in the absence of immediate temporary injunctive relief would be severe.  This factor clearly weighs in favor of issuing a TRO.

Finally, with respect to the public interest, that factor likewise weighs in favor of issuance of TRO here.  Plaintiff has shown that transferring Gordon Oaks residents to other facilities will bear a substantial risk of "transfer trauma."  *See Ridgeview Manor of Midlands, L.P. v. Leavitt*, 2007 WL 1110915, *8 (D.S.C. Apr. 9, 2007) ("the consideration of public interest factor weighs heavily in favor of granting the temporary restraining order to the extent that the elderly and poor nursing home patients may be forced to relocate[] if the temporary restraining order is not granted"); *Claridge House*, 795 F. Supp. at 1405 ("As no finding of immediate jeopardy was made in the instant case … the interests of the public and Mt. Vernon residents would seem to be in continuing plaintiff's provider agreement … without disrupting the residents, pending further action by the Secretary.").  Absent facts or reason to believe that residents are endangered by continuing to live and receive nursing care at Gordon Oaks pending the administrative hearing process, the "public interest" factor favors issuance of a TRO.

**III.   Conclusion.**

For all of the foregoing reasons, the Court finds that the Motion for Issuance of Temporary Restraining Order (doc. 4) is **granted**.  It is therefore **ordered** as follows:

1. Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are **temporarily enjoined and restrained** from terminating Gordon Oaks' Medicare and Medicaid provider agreements, pending a pre-termination administrative hearing;

2. Pursuant to Rule 65(c), Fed.R.Civ.P., the Court has considered whether plaintiff should give security, but has concluded that no such security is required here in the absence of any reason to believe that defendants will incur costs and damages if later found to have been wrongfully enjoined or restrained;

3. This Order shall expire at the close of business on **February 3, 2012**, unless extended for good cause shown or by consent of the adverse parties pursuant to Rule 65(b)(2), Fed.R.Civ.P.;

4. Any defendant wishing to be heard on plaintiff's request to convert this Temporary Restraining Order into a Preliminary Injunction must file a brief supported by authorities (along with any affidavits, exhibits, or other evidence it

      wishes to submit into the record) by no later than **January 27, 2012**.  Plaintiff will be allowed to file a reply on or before **January 31, 2012**.  If the Court determines that oral argument or an evidentiary hearing is necessary, the parties will be notified and a hearing will be scheduled.  Otherwise, the request for preliminary injunction will be taken under submission after January 31, 2012, and will be ruled on promptly thereafter; and

5.     Plaintiff's counsel is **ordered** to serve copies of this Order on defendants in a manner calculated to alert them immediately to same.

DONE and ORDERED this 20th day of January, 2012.

                                                  s/ WILLIAM H. STEELE
                                                  CHIEF UNITED STATES DISTRICT JUDGE