**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GOS OPERATOR, LLC,** | ) | |
| | ) | **PUBLISH** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 12-0035-WS-N** |
| | ) | |
| **KATHLEEN SEBELIUS, Secretary of** | ) | |
| **the U.S. Department of Health and Human** | ) | |
| **Services,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on plaintiff's construed Motion for Preliminary Injunction (doc. 4). The parties have submitted extensive briefing on the Motion (including supplemental briefing as directed by the Court). The Motion is now ripe.[1] Plaintiff's Motion for Leave to Exceed Page Limit for Reply Brief (doc. 33) is **granted** for cause shown, and its Reply (doc. 34) will be accepted and considered in its present form.[2]

---

[1]   The Court takes this matter under submission without a hearing. *See* Local Rule 7.3. Under Circuit law, a hearing is required on a motion for preliminary injunction only if there are contested issues of fact that require credibility determinations. *See Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003) (observing that an "evidentiary hearing is not always required before the issuance of a preliminary injunction" unless "facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue") (citations omitted); *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (opining that where dispute revolves around inferences to be drawn from facts, rather than raw facts themselves, district court in sound discretion may determine whether evidentiary hearing is needed by balancing interests of speed and practicality against those of accuracy and fairness). Nothing in the parties' submissions suggests that the Motion for Preliminary Injunction turns on credibility determinations or bitterly contested facts; rather, the parties' disagreement over the propriety of Rule 65 relief rests on purely jurisdictional and legal issues as to which an evidentiary hearing would not be of material assistance to the Court or to the parties.

[2]   The day after briefing closed on the Motion for Preliminary Injunction, defendants filed a document styled "Defendant's Request for Hearing" (doc. 35) setting forth certain supplemental legal arguments and case authorities. The Court will treat this filing as a sur-reply and will consider the materials presented therein in resolving the Rule 65 Motion.

## I.      Relevant Background.

Plaintiff, GOS Operator, LLC ("GOS"), is the operator of Gordon Oaks Healthcare Center ("Gordon Oaks"), a skilled nursing facility located in Mobile, Alabama.  At present, Gordon Oaks participates in the Medicare program pursuant to a provider agreement (the "Provider Agreement") with defendant Secretary of the United States Department of Health and Human Services (the "Secretary").  The Secretary has announced its intention to terminate the Provider Agreement, based on a series of on-site inspections (called "surveys") conducted at Gordon Oaks over a six-month period from July 21, 2011 through January 18, 2012.  According to the Secretary, those surveys reveal that Gordon Oaks is not in substantial compliance with federal health and safety requirements for Medicare residents, as necessary for continued participation in the Medicare program.

On January 19, 2012, the Secretary (by and through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services) issued a written notice of involuntary termination to Gordon Oaks.  (Doc. 26, Exh. 1.)  The notice referenced surveys performed on January 8, 2012 and January 18, 2012, and set forth CMS's conclusion that Gordon Oaks "remains out of substantial compliance with the Medicare/ Medicaid participation requirements."  (*Id.* at 1.)[3]  On that basis, CMS indicated in the January 19 letter that "[y]our Medicare provider agreement will be terminated at midnight on January 21, 2012 ….  Medicare and Medicaid payments for services rendered to those residents admitted to Gordon Oaks Healthcare Center before January 21, 2012, will continue to be made up to a 30-day period, in order to facilitate the orderly transfer/relocation of residents."  (*Id.* at 2 (emphasis omitted).)  The January 19 letter further notified Gordon Oaks that "[i]f you disagree with CMS determinations that are based on the January 8, 2012 and January 18, 2012 surveys …, you or

---

[3]      The specific findings and determinations of these surveys are, in large part, beyond the scope of the narrow judicial proceedings instituted by GOS.  Nonetheless, it is potentially significant that the January 8 survey did not reveal any deficiencies rising to the level of "immediate jeopardy" to residents' health and safety, and that the sole "immediate jeopardy" deficiency (relating to the faulty performance of a generator during survey testing) identified on January 18 was abated to the surveyors' satisfaction before they departed the premises.  As such, there is no indication that Gordon Oaks is laboring under an "immediate jeopardy" situation at the present time, and the Secretary does not purport to be terminating the Provider Agreement pursuant to an "immediate jeopardy" finding.

your legal representative may request a hearing before an administrative law judge of the Department of Health and Human Services, Departmental Appeals Board." (*Id.* at 4.)

It is undisputed that GOS has invoked the administrative appeals process as to each survey conducted between July 21, 2011 and January 18, 2012 that has found Gordon Oaks not to be in substantial compliance with program requirements. (Doc. 1, ¶¶ 69, 71 & Exh. T; McAuliffe Decl. (doc. 34-1), at Att. 2.)  Most recently, in a January 30, 2012 letter sent to CMS and the Departmental Appeals Board, GOS requested "an expedited hearing on its appeals," on the grounds that "[a]n expedited hearing is warranted in order to ensure that the administrative proceeding is resolved as expeditiously as possible." (McAuliffe Decl., at Att. 2.)  To date, GOS has not received an administrative hearing on any of its appeals from deficiencies identified in surveys conducted at Gordon Oaks between July 2011 and January 2012.[4]  The record is devoid of information that such a hearing is imminent, and there is no indication as to how soon an expedited administrative hearing can or will occur in this case.  Nonetheless, the Secretary's conduct clearly evinces its intention to proceed with the termination of Gordon Oaks' Provider Agreement at this time, and to allow the administrative appeals process to play out on a post-termination basis, notwithstanding GOS's presentation of pre-termination requests for administrative hearing that remain pending today.

The trouble with this arrangement from GOS's perspective is that, according to its evidence, termination of the Provider Agreement would inflict devastating harm on Gordon Oaks, inasmuch as: (i) it would necessitate transfer all Medicaid and Medicare residents to other facilities; (ii) the loss of Provider Agreements would constitute a catastrophic event of default under GOS's lease, resulting in termination of the lease and closure of the entire Gordon Oaks campus; and (iii) the ultimate effect of termination of the Provider Agreements would be that

---

[4]        In fairness to defendants, it does not appear that GOS specifically requested that the administrative hearing be expedited until its January 30, 2012 letter, some 11 days <u>after</u> it filed this lawsuit.  Moreover, the record shows that GOS did not file a written administrative appeal of deficiencies noted in October 2011 and November 2011 surveys until January 13, 2012, just six days before it filed this lawsuit.  That is not to say that GOS's administrative appeals were untimely, but it is to say that plaintiff does not appear to have been as diligent as it might have been in seeking out an expedited administrative hearing challenging the observed deficiencies well before the conclusion of the July 21, 2011 – January 21, 2012 six-month survey cycle brought the dispute to a head via the Secretary's termination decision.

GOS would cease operations and go out of business.  (Feuer Decl. (doc. 1, Exh. B), ¶¶ 3-5.)  In GOS's view, a post-termination administrative hearing would be useless and ineffectual because "Plaintiff will not survive long enough to contest the termination through the appropriate administrative process."  (Doc. 34, at 1.)[5]

In light of these circumstances, GOS filed its Complaint and Motion for Temporary Restraining Order on January 19, 2011, the same day that CMS issued the termination notice and a bare two days before the Secretary intended to terminate Gordon Oaks' Provider Agreements. The Complaint does not seek review of the underlying administrative determinations.  GOS is not asking this Court to make any findings as to whether Gordon Oaks was or was not in substantial compliance with program requirements at any time.  Nor does the Complaint request that judicial review supplant the administrative appeals process.  Rather, the Complaint by its terms "seeks only to preserve the status quo pending the outcome of the administrative hearing" by enjoining defendants from terminating Gordon Oaks' provider agreements "until its challenges to the Defendants' actions have been heard and decided by an administrative law judge of the Departmental Appeals Board of Defendant HHS."  (Doc. 1, ¶ 6.)  As grounds for the requested injunction, the Complaint alleges causes of action for violation of plaintiff's procedural due process rights (failure to provide pre-termination administrative hearing), violation of substantive due process (arbitrary and capricious termination of provider agreements), and *ultra vires* (Secretary exceeding statutory authority by terminating provider agreement despite no "immediate jeopardy" deficiencies and during pendency of administrative hearing process).  Plaintiff has joined neither the constitutional claims nor the *ultra vires* claim to its pending administrative appeals before the HHS Departmental Appeals Board.[6]

---

[5]      Again, however, the record is silent as to important questions of timing.  How soon could GOS receive a post-termination administrative hearing and decision?  How soon after any default event would Gordon Oaks have to vacate the premises if, indeed, the lessor declines to waive the default?  It appears, however, that the catastrophic harm to GOS for termination of the Provider Agreement would not be incurred instantaneously upon termination, but that there would be some lag time during which such harm could be avoided via prompt post-termination hearing, assuming that such a hearing could be convened and resolved with sufficient swiftness.

[6]      Because this fact is material to the jurisdictional analysis, the Court has carefully reviewed the administrative appeal papers submitted by GOS.  Although the January 13, 2012 Request for Appeal and the January 30, 2012 Request for Appeal set forth numerous assignments of error, nowhere do those documents specifically request administrative review on the grounds (Continued)

-4-

On January 20, 2012, the undersigned issued a series of Orders (docs. 13, 17, 18) that granted GOS's Motion for Temporary Restraining Order and considered and rejected the Government's arguments for reconsideration or vacatur of same.  The resulting TRO enjoins and restrains defendants "from terminating Gordon Oaks' Medicare and Medicaid provider agreements, pending a pre-termination administrative hearing."  (Doc. 13, at 11.)  The TRO was to expire at the close of business on February 3, 2012; however, on that date, the undersigned extended the TRO through February 10, 2012 for good cause under Rule 65(b)(2) to facilitate supplemental briefing of a substantial merits issue that the Government had not previously addressed.  The parties have now had a full and fair opportunity to brief the question of whether the TRO should be converted into a Preliminary Injunction.  The Government opposes entry of a preliminary injunction on both jurisdictional and merits grounds.

## II.    Jurisdiction.

As a threshold matter, the Government asserts that this action should be dismissed for lack of subject-matter jurisdiction.[7]

### A.    Section 405(h) and the Channeling Requirement.

The statutory underpinning of defendants' jurisdictional argument is 42 U.S.C. § 405(h).  That section provides, in part, as follows: "No action against the United States, the [Secretary],

---

that agency termination of the Provider Agreement without a pre-termination hearing would violate procedural due process, or that terminating the Provider Agreement in the absence of an "immediate jeopardy" finding or while the hearing process remains pending would exceed the Secretary's statutory authority.  (*See* doc. 1, Exh. T; McAuliffe Decl., at Att. 2.)  At best, these Requests for Appeal (which are otherwise comprehensive and detailed) provide only vague allegations of procedural, constitutional and other deprivations associated with "SSA's citation of deficiencies and CMS's resulting imposition of the [Civil Money Penalties]."  Those allegations do not reasonably encompass the specific claims for relief that GOS asserts in this lawsuit.

[7]    This argument must be considered antecedent to reaching the merits of the Motion for Preliminary Injunction.  After all, "[i]f the court finds that it does not have subject matter jurisdiction, the court's sole remaining act is to dismiss the case for lack of jurisdiction." *Guevara v. Republic of Peru*, 468 F.3d 1289, 1305 (11th Cir. 2006) (citation and internal quotation marks omitted); *see also Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1092 (11th Cir. 2010) ("[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue.") (citation omitted).

or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter." 42 U.S.C. § 405(h).[8] This means that § 1331 (federal question) jurisdiction is categorically unavailable for claims arising under the Medicare Act.  In lieu of § 1331, Congress created a special jurisdictional foothold for these claims, as follows:  "Any individual, after any final decision of the [Secretary] made after a hearing to which he was a party … may obtain a review of such decision by a civil action commenced within sixty days."  42 U.S.C. § 405(g).  "Section 405(h) purports to make exclusive the judicial review method set forth in § 405(g)."  *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000).  Thus, the general rule is that, for any claim arising under the Medicare Act, ordinary federal-question jurisdiction is lacking and a claimant must instead abide by special review procedures before raising its claim in a judicial forum.

The Supreme Court has explained that the net effect of § 405(h) is that it "demands the 'channeling' of virtually all legal attacks through the agency," thereby assuring the Secretary "greater opportunity to apply, interpret or revise policies, regulations, or statutes without possibly premature interference by different individual courts."  *Illinois Council*, 529 U.S. at 13; *see also Lifestar Ambulance Service, Inc. v. United States*, 365 F.3d 1293, 1296 (11th Cir. 2004) ("The reality, however, is that the Medicare statute demands the channeling of virtually all legal attacks through the [DHHS] before a health care provider may seek judicial review of a claim arising under the Medicare statute.") (citation and internal quotation marks omitted).  The Eleventh Circuit has characterized § 405(h) as a "nearly absolute channeling requirement" that "serves important government interests in administrative efficiency and judicial economy."  *Lifestar*, 365 F.3d at 1296.  Simply put, § 405(h) "channels most, if not all, Medicare claims through this special review system."  *Illinois Council*, 529 U.S. at 8.[9]

---

[8]        Although § 405(h) is found in the Social Security Act, rather than the Medicare Act, this provision is adopted and incorporated into the Medicare Act by operation of 42 U.S.C. § 1395ii.  *See, e.g., Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 9, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ("Section 1395ii makes § 405(h) applicable to the Medicare Act 'to the same extent as' it applies to the Social Security Act.").

[9]        The parties and, indeed, many courts colloquially refer to § 405(h) as an exhaustion requirement.  In actuality, however, "the bar of § 405(h) reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies' ….  (Continued)

### B.    Plaintiff's Claims "Arise Under" the Medicare Act.

In response to these expansive, binding judicial proclamations regarding the § 405(h) channeling requirement for claims arising under the Medicare statute, GOS asserts, with no citations or explanatory reasoning, that "the claims asserted herein do not arise under the Medicare Act." (Doc. 34, at 6.) This contention is not persuasive. "A claim arises under the Medicare Act if both the standing and the substantive basis for the presentation of the claim is the Medicare Act, … or if the claim is inextricably intertwined with a claim for Medicare benefits." *RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, 395 F.3d 555, 557 (5th Cir. 2004) (citation omitted). Courts have construed these principles broadly.[10]

Plaintiff's reluctance to elaborate on this argument is understandable. After all, it is difficult to conceive of how a Medicare provider's constitutional and statutory challenges to the Secretary's authority to terminate its provider agreement under the Act without a pre-termination hearing and without findings of immediate jeopardy, all during the pendency of an administrative hearing process prescribed by the Act, could reasonably be deemed not to "arise under" the

_____

Doctrines of 'ripeness' and 'exhaustion' contain exceptions, however, which exceptions permit early review when, for example, the legal question is 'fit' for resolution and delay means hardship … or when exhaustion would prove 'futile'." *Illinois Council*, 529 U.S. at 12-13. The point is that, in this limited § 405(h) context, ordinary judge-created principles of exhaustion and ripeness (and their corollaries of allowing judicial review in cases of hardship caused by delay, or futility of administrative review) are not in play. Thus, the only operative exceptions to the channeling requirement are those developed in jurisprudence specific to §§ 405(g) and (h).

[10]    *See Puerto Rican Ass'n of Physical Medicine and Rehabilitation, Inc. v. United States*, 521 F.3d 46, 48 (1st Cir. 2008) ("the Supreme Court has interpreted broadly the section 405(h) bar, holding that a claim 'arises under' the Social Security or Medicare Act if 'the standing and the substantive basis' for the claim derive from that statute") (citations omitted); *Physician Hospitals of America v. Sebelius*, 770 F. Supp.2d 828, 830 (E.D. Tex. 2011) ("This exhaustion rule is virtually absolute and applies regardless of the basis of the challenge. … For example, a constitutional challenge to a statute or regulation must follow this administrative channel."); *Acquisto v. Secure Horizons ex rel. United Healthcare Ins. Co.*, 2011 WL 6780870, *5 (M.D. Fla. Dec. 27, 2011) (§ 405(h) "arises under" requirement is sufficiently broad to reach "constitutional or statutory claims which cannot be resolved administratively, but nevertheless must be channeled through the administrative process"); *Lynncore Medgroup, Inc. v. Sebelius*, 2011 WL 6116536, *5 (E.D. Tex. Nov. 10, 2011) ("Courts broadly construe the phrase 'arising under' to include all claims for relief, regardless of whether the claimant seeks benefits, or declaratory or injunctive relief.") (citation omitted).

Medicare Act, as that term is applied by the Supreme Court and Eleventh Circuit. *Cf. Cochran v. U.S. Health Care Financing Admin.*, 291 F.3d 775, 779 (11th Cir. 2002) (finding that even claims including "a challenge to the constitutionality of the statute or the regulations interpreting it" are claims "arising under" the Medicare Act for § 405(h) purposes); *V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020, 1031-32 (11th Cir. 1983) (rejecting provider's theory that § 405(h) preclusion does not apply to action where provider "is not asking for review on the merits but merely a stay to maintain the status quo"). Logically, GOS's claims must "arise under" the Medicare Act (in the broad sense of the term) because it seeks to retain rights and privileges conveyed under the Act, and because plaintiff is arguing that the Secretary exceeded limits on her authority prescribed by the Act. Moreover, plaintiff has identified no authorities holding that claims akin to those it brings do not arise under the Medicare Act for § 405(h) purposes. Under the circumstances, the Court cannot embrace GOS's bald statement that "the claims asserted herein do not arise under the Medicare Act" (doc. 34, at 6) merely because plaintiff is not directly seeking review of the Secretary's "out-of-substantial-compliance" assessment herein.[11]

       ***C.    "No Review at All" Exception.***

      Next, GOS contends that even if its claims do arise under the Medicare Act, § 405(h) poses no impediment to this lawsuit at this time because deferring judicial review until after a potentially lengthy administrative appeals process expires would be tantamount to no judicial review at all.

---

[11]     On this point, *Northlake Community Hospital v. United States*, 654 F.2d 1234 (7th Cir. 1981), is instructive. The plaintiff in *Northlake* was a Medicare provider that filed suit for injunctive relief against the Department of Health and Human Services, claiming that the Secretary had "violated the hospital's right to due process by failing to conduct a hearing prior to the termination of Northlake's Medicare provider agreement." *Id.* at 1236. Although the plaintiff argued that § 405(h) did not apply to these claims, the Seventh Circuit found no § 1331 jurisdiction and required the plaintiff to comply with § 405(h). *See id.* at 1240 ("Northlake's claim in the instant case involves the procedures for terminating a provider agreement …. Under *Salfi* and *Trinity*, Northlake's allegation of federal question jurisdiction is defective."); *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072 (7th Cir. 1982) (finding federal question jurisdiction to be barred by § 405(h) where the skilled nursing facility plaintiffs challenged termination of Medicare provider agreements without pre-termination hearing).

-8-

The Supreme Court has found that § 1395ii "does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Illinois Council*, 529 U.S. at 19; *see also Council for Urological Interests v. Sebelius*, --- F.3d ----, 2011 WL 6450767, *5 (D.C. Cir. Dec. 23, 2011) ("the Supreme Court has understood section 405(h) as having only channeling force, not, as the government would have it, foreclosing force"); *BP Care, Inc. v. Thompson*, 398 F.3d 503, 508 (6th Cir. 2005) ("parties affected by Medicare administrative determinations may sue in federal court under 28 U.S.C. § 1331, bypassing § 405 preclusion, only where requiring agency review pursuant to § 405(h) would mean no review at all") (citation omitted).

Make no mistake: This "no review at all" exception (sometimes dubbed the "*Illinois Council* exception" or the "*Michigan Academy* exception" in the case law) is both narrowly circumscribed and rarely applicable. As the *Illinois Council* Court cautioned, "we do not hold that an individual party could circumvent § 1395ii's channeling requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case." 529 U.S. at 22. "Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id.* at 23. At its core, "the *Illinois Council* inquiry is fundamentally a practical one. The exception applies not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court." *Council for Urological Interests*, 2011 WL 6450767, at *8 (citation omitted).[12] For example, the kind of practical-denial-of-review circumstance in which the *Illinois Council* exception has been found to apply is one in

---

[12]    *See also American Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) ("if the claimant can obtain judicial review only in a federal question suit, § 1395ii will not bar the suit," but in order to bypass the § 1395ii requirements "[t]he difficulties must be severe enough to render judicial review unavailable as a practical matter" if the channeling process were followed); *Giesse v. Secretary of Dep't of Health and Human Services*, 522 F.3d 697, 707 (6th Cir. 2008) (in applying the "no review at all" exception, courts "must examine whether [the plaintiff] is simply being required to seek review first through the agency or is being denied altogether the opportunity for judicial review") (citations omitted); *Physician Hospitals*, 770 F. Supp.2d at 831 ("if enforcing the administrative presentment requirement would cause the challenging party to endure a hardship so severe that they would never pursue it, then it would qualify as essentially no review at all").

which requiring compliance with § 405(h) would mean that plaintiffs "must construct or expand a hospital at a significant expense, file a Medicare reimbursement claim with the Secretary, and wait for it to be denied before they could bring their claims before the Court as a challenge to the Secretary's finding." *Physician Hospitals of America v. Sebelius*, 770 F. Supp.2d 828, 831-32 (E.D. Tex. 2011) (indicating that this appeared to be the first time any court in the Fifth Circuit had ever deemed the *Illinois Council* exception to apply).

GOS maintains that the Gordon Oaks situation lies within the narrow confines of the *Illinois Council* exception. In that regard, it bears repeating that GOS's claims in this action are for violation of procedural due process (grounded in the notion that the Secretary's termination of Gordon Oaks' provider agreements without a prior administrative hearing violates the Fifth Amendment) and for *ultra vires* (predicated on the theory that the Secretary is exceeding her statutory authority by terminating a provider agreement in the absence of immediate jeopardy, and during the pendency of an administrative appeal).[13] According to GOS, if judicial review of these claims must be postponed until the administrative appeals process concludes, then "Plaintiff can have no meaningful review at all because basis for these claims – that Plaintiff is entitled to protection *pending the administrative process* – will be moot by the time the administrative process has been completed. Plaintiff's claims, by definition, must be resolved prior to administrative review or not at all." (Doc. 34, at 8.) So, GOS reasons, the "no review at all" exception applies because of the inherently time-sensitive nature of plaintiff's claims.

There is a glaring flaw in GOS's attempt to evade § 405(h) through this reasoning. The problem is this: Why couldn't GOS present the very claims it seeks to bring in this action (*i.e.*, procedural due process violation, *ultra vires*) to the Secretary first via the administrative process? In other words, why couldn't plaintiff honor the special review path contemplated by § 405(g) and (h) for these constitutional/statutory claims, and then seek judicial review of the Secretary's final decision of those claims while the administrative process is still pending as to the

---

[13]     Nowhere in its filings on the request for preliminary injunction does GOS argue that its substantive due process claim either creates a jurisdictional hook or a sufficient merits argument to warrant Rule 65 relief. To the contrary, that claim appears targeted more at the substance of the Secretary's decision, which overlaps substantially with the administrative appeal and is the kind of judicial review that GOS elsewhere professes not to seek in this case. Accordingly, the Court confines its analysis herein to the procedural due process and *ultra vires* claims animating plaintiff's request for preliminary injunction.

underlying substantive appeals of the "not-in-substantial-compliance" determinations?  GOS has not done so, and has not explained this omission.  Yet *Illinois Council* made clear that it is, indeed, possible to channel review of such claims through the agency.  "The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one … is beside the point because it is the 'action' arising under the Medicare Act that must be channeled through the agency.  After the action has been so channeled, the court will consider the contention when it later reviews the action."  529 U.S. at 23.  After all, "a court reviewing an agency determination under § 405(g) has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide."  *Id.*[14]  This was not merely idle talk by the Supreme Court, either.  *Illinois Council* emphasized that "[p]roceeding through the agency in this way provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges."  *Id.* at 24.  That is to say, if a claimant first brings constitutional and statutory claims in the administrative process, even knowing that the Secretary may not decide them, such conduct would satisfy both the letter of § 405(h) and the underlying policy objectives contemplated by Congress in crafting that special review mechanism.[15]  So GOS could have presented constitutional and statutory claims to the Secretary along with its substantive claims, then pursued judicial review of those constitutional and statutory claims even as the administrative process remained pending as to the substantive claims.  Thus, GOS's assertion that it could not possibly obtain judicial review of its constitutional and statutory claims if it is forced to comply with § 405(h) is incorrect.

---

[14]     *See also Lifestar Ambulance*, 365 F.3d at 1297 ("despite the fact that some claims, such as constitutional or statutory challenges, cannot be resolved administratively, they must still proceed first through the administrative process. … Such claims are subject to plenary judicial review under the Medicare remedial scheme only *after* the administrative review process has been exhausted."); *Fox Ins. Co. v. Sebelius*, 2010 WL 2539653, *2 (2nd Cir. June 22, 2010) ("Any claims Fox may have challenging the agency's interpretation or implementation of its regulations are properly raised *after* it has exhausted the available administrative remedies.").

[15]     In this case, GOS's presentment of these claims would allow the Secretary an opportunity to reconsider the propriety of its practices of not allowing pre-termination hearings, terminating provider agreements in the absence of "immediate jeopardy" findings, and terminating provider agreements during the pendency of the administrative hearing process.  In this way, § 405(h) exhaustion would serve its intended purpose, without completely foreclosing judicial review of those claims to GOS.

To be clear, the Court is not suggesting that GOS's failure to present its constitutional and statutory claims to the Secretary amounts to a violation of the nonwaivable, nonexcusable requirement that it present its action arising under the Medicare Act to the agency before bringing it in federal court.  As discussed *infra*, the Supreme Court has deemed this nonwaivable element to be satisfied where a claimant presented to the Secretary a claim that his benefits should not be terminated, without raising a constitutional claim to a pretermination hearing that he later brought in federal court.  *Mathews v. Eldridge*, 424 U.S. 319, 329, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("The fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing is not controlling" as to whether the nonwaivable jurisdictional presentment requirement is satisfied, where the underlying claim for benefits was presented to the Secretary).  GOS has presented its claim for benefits to the Secretary, albeit not its constitutional/ statutory challenges raised here.  The point here is not that GOS flunked the presentment requirement (it did not), but is instead that GOS's "no review at all" argument is mistaken because plaintiff <u>could have</u> presented its constitutional/statutory claims to the agency for review, obtained waiver of intermediate procedural steps, and proceeded to bring these claims in federal court in a prompt and timely fashion.  The availability of that path belies plaintiff's insistence that without judicial review of his claims now, review could never be had because they would be mooted by the end of the administrative appeals process.

It is no response to the foregoing for plaintiff to protest that administrative review of these claims could not be completed in time to allow meaningful judicial review.  The Supreme Court in *Illinois Council* specifically shot down this line of reasoning, concluding that during agency review of such statutory or constitutional claims, the Secretary is capable of proceeding in a nimble and prompt manner.  *See Illinois Council*, 529 U.S. at 24 ("Nor need it waste time, for the agency can waive many of the procedural steps set forth in § 405(g) … and a court can deem them waived in certain circumstances, … even though the agency technically holds no 'hearing' on the claim.").  Besides, if (as discussed *infra*) a claim falls within the narrow class of collateral claims addressed in *Mathews v. Eldridge*, then a court can deem the § 405(g) process satisfied without administrative review (as opposed to declaring § 405(g) and (h) inapplicable, as occurs when the *Illinois Council* exception applies).

In short, then, the availability of this alternative administrative path, which GOS elected not to take with regard to its constitutional and statutory claims, forecloses it from availing itself

-12-

of the "no review at all" exception to the § 405(h) special review process on the theory that these claims will be moot by the time the administrative procedure ends.[16]

---

[16]     In the alternative, GOS maintains that the "no review at all" exception applies because termination of its Provider Agreements "will result in the ultimate destruction of Gordon Oaks long before the administrative process has run its course." (Doc. 34, at 11.) To be sure, as noted in the January 20 Order granting plaintiff a TRO, GOS has made a substantial showing that its economic and business circumstances, the default provision in its lease, and other realities of plaintiff's condition render it unlikely that Gordon Oaks can remain in business long enough to conclude the administrative appeals process and have its day in court, such that the prospect of subsequent judicial review may be a mirage. The problem with that argument is that, as the Government correctly explains, it is too closely tied to GOS's individual, specific circumstances to trigger the *Illinois Council* exception to § 405(h)'s channeling requirement. Fundamentally, what GOS describes is an individual hardship in this isolated, particular case if judicial review is postponed. Plaintiff has not shown that "***as applied generally to those covered by a particular statutory provision***, hardship ***likely found in many cases*** turns what appears to be simply a channeling requirement into complete preclusion of judicial review." *Illinois Council*, 529 U.S. at 22-23 (emphasis added). In balking at what it perceives to be "disparaging" characterizations of its position by the Government, GOS misses the point. *Illinois Council* unequivocally states that the "no review at all" exception is not available for a claimant based on its own unique circumstances, but rather applies only where the hardship has broader, large-scale reach. The "survival" hardship identified by GOS is borne of its own particular circumstances, not the general effect of particular provisions or practices affecting many other providers in like manner. As such, GOS's purported inability to survive long enough to finish the administrative appeals process is not the kind of circumstance for which the *Illinois Council* exception is available. For the type of hardship identified by GOS here, the Supreme Court explained that "individual hardship may be mitigated in a different way, namely, through excusing a number of the steps in the agency process, though not the step of presentment of the matter to the agency." 529 U.S. at 23; *see also Mathews*, 424 U.S. at 330 ("the Secretary may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer"); *Council for Urological Interests*, 2011 WL 6450767, at *6 ("a provider bringing a pure legal challenge to the validity of a regulation may invoke the Medicare Act's provisions for expedited judicial review, in which case a provider may also obtain prompt access to the federal courts," but "providers must take the extra step of presenting their claim to the agency for an initial determination"); 42 U.S.C. § 1395ff(b)(2) (setting forth procedures for expediting access to judicial review). In other words, *Illinois Council* leaves no doubt that for individual hardships of the kind described by GOS, the "no review at all" exception is simply not available, but may instead be addressed by having the claimant present the claim to the agency, then excusing a number of steps in the agency process to bring administrative review to a conclusion and pave the way for prompt judicial review that comports with § 405(h).

D.      *"Entirely Collateral" Exception.*

Next, GOS asserts that the requirements of § 405(g) should be waived because "Plaintiff's claims are entirely collateral to the issues being litigated through the administrative process." (Doc. 34, at 10.)

In support of this argument, plaintiff relies on *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).  In *Eldridge*, the Supreme Court explained that § 405(g)'s requirement that there be a final decision by the Secretary after a hearing as a condition to federal jurisdiction actually consists of a waivable and a nonwaivable element.  "The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted.  The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary."  424 U.S. at 328.  *Eldridge* did not declare § 405(g) inapplicable or recognize § 1331 jurisdiction over the claimant's claims.  Rather than declaring an exception to the channeling requirement, the *Eldridge* Court instead found that the § 405(g) "final decision" requirement would be deemed satisfied as to a constitutional claim alleging a right to a pre-termination hearing where: (i) "Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement"; (ii) Eldridge's constitutional claim "rests on the proposition that full relief cannot be obtained at a postdeprivation hearing"; and (iii) Eldridge had raised "at least a colorable claim that … an erroneous termination would damage him in a way not recompensable through retroactive payments."  424 U.S. at 330-31.  In so doing, *Eldridge* hinged on "the core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered."  *Id.* at 331 n.11.

GOS contends that *Eldridge* is applicable here and that the exhaustion element embodied in the § 405(g) "final decision" requirement should be deemed waived.[17]  Like the claimant in *Eldridge*, GOS is bringing a constitutional challenge demanding a pre-termination hearing, which challenge is entirely collateral to its substantive claim of entitlement to participate in the Medicare program.  Like the claimant in *Eldridge*, the crux of GOS's constitutional claim is that

---

[17]      GOS also asserts that it has complied with the nonwaivable "presentment" element because its Notices of Appeal squarely presented a claim for benefits to the Secretary, and did so before GOS initiated this litigation in federal court.

a postdeprivation hearing will not suffice to grant it full relief.  And like the claimant in *Eldridge*, GOS has made a showing that erroneous termination of its Provider Agreement will damage it in a way not recompensable through retroactive payments.  (Although the parties do not address GOS's *ultra vires* claims specifically, much the same analysis would appear to apply to them.  Certainly, the Secretary does not contend that any application of the "entirely collateral" exception must be confined to GOS's procedural due process cause of action.)  By all appearances, then, GOS's circumstances appear ideally suited for application of the "entirely collateral" exception to § 405(g)'s exhaustion requirement.

In response, the Secretary posits three arguments against application of *Eldridge* here.[18] First, the Secretary asserts that "the 'collateral claims exception' did not survive *Illinois Council*."  (Doc. 26, at 11.)  To support this assertion, the Government relies on the following passage from *Illinois Council*:  "[W]e cannot distinguish *Salfi* and *Ringer* from the case before us.  Those cases themselves foreclose distinctions based upon … the 'collateral' versus 'noncollateral' nature of the issues."  529 U.S. at 13-14.  The Secretary takes this language out of context and overlooks a vital distinction between these two Supreme Court decisions.  *Illinois Council* did not purport to overrule *Eldridge*'s creation of a "collateral claims" exception; to the contrary, after the passage invoked by defendants, *Illinois Council* went on to clarify that, rather than creating an exception to the § 405(g) special review procedures, *Eldridge* merely provided a circumstance under which those procedures would be deemed to have been satisfied.  *See Illinois Council*, 529 U.S. at 15 ("The [*Eldridge*] Court characterized the constitutional issue the respondent raised as 'collateral' to his claim for benefits, but it did so as a basis for requiring the agency to excuse … some (but not all) of the procedural steps set forth in § 405(g)."); *Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 362 (6th Cir. 2000) ("The Supreme Court recently explained that the *Eldridge* opinion did not create an exception to the application of § 405(g) and (h), but rather required the Secretary to excuse some of its procedural requirements so that its decision would be considered a 'final decision' and judicial review could follow under § 405(g).").  Seen through this lens, then, the language on which the Government

---

[18]      The Government does <u>not</u> raise any challenge to plaintiff's framing of its claims in this action as "entirely collateral" for purposes of an *Eldridge* analysis.  Accordingly, the Court accepts plaintiff's characterization of its claims in this manner as accurate.

relies does not stand for the proposition that the "collateral claims" exception is dead, but simply means that a claimant cannot invoke § 1331 jurisdiction for a claim (and thereby proceed <u>outside</u> the § 405(g) framework, as opposed to within it) through the expediency of labeling his claim "collateral." An accurate reading of *Illinois Council* is that it expressly recognized *Eldridge*'s continuing vitality as a means of satisfying certain § 405(g) requirements, while clarifying that *Eldridge* does not provide an avenue for skipping past § 405(g) altogether.[19] Accordingly, the Court rejects the Government's contention that the "collateral claims" provisions of *Eldridge* did not survive *Illinois Council*.[20]

Second, the Government contends in conclusory fashion that "jurisdiction is lacking because Gordon Oaks's claim is not colorable." (Doc. 26, at 11.) The "colorable" element of this exception is that the claimant must raise "at least a colorable claim that … an erroneous termination [of benefits] would damage him in a way not recompensable through retroactive payments." *Eldridge*, 424 U.S. at 331. A fair reading of this language is that what must be "colorable" is the claimant's showing of irreparable harm. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (characterizing *Eldridge* as holding that § 405(g) "was not intended to bar federal jurisdiction over a due process challenge that was 'entirely collateral' to the denial of benefits … where the petitioner had made a ***colorable showing that full postdeprivation relief could not be obtained***") (emphasis added). As

---

[19]    The validity of this interpretation is bolstered by *Illinois Council*'s explanation that "the agency can waive many of the procedural steps set forth in § 405(g) … and a court can deem them waived in certain circumstances, see *Eldridge*, 424 U.S. at 330-331." 529 U.S. at 24. The "collateral claims" exception described in *Eldridge* constitutes precisely those "certain circumstances" in which a court can deem certain of § 405(g)'s procedural steps waived.

[20]    Besides, *Illinois Council* had no reason to abrogate *Eldridge* because, fundamentally, *Eldridge* (like the case at bar) was a case about when waivable exhaustion requirements may be deemed waived when the presentment element is satisfied. *See* 424 U.S. at 330 ("As the nonwaivable jurisdictional element was satisfied, we next consider the waivable element."). By contrast, in *Illinois Council*, the presentment element was not met because the claimant never brought an administrative appeal at all. *See* 529 U.S. at 24 ("At a minimum, … the matter must be presented to the agency prior to review in a federal court. This the Council has not done."). Because *Illinois Council* was about non-compliance with the presentment/ jurisdictional requirement, that Court had no occasion to overrule or modify *Eldridge*, which created an exception for the exhaustion/non-jurisdictional requirement, not the nonwaivable, jurisdictional presentment requirement.

discussed in the "irreparable harm" section of the January 20 Order entered in this case, GOS has made a substantial showing that, if the termination of its provider agreements is erroneous, such termination would damage it in a way not recompensable through retroactive payments. The "colorable" requirement is satisfied.[21]

Third, the Government states that "Plaintiff failed to satisfy the non-waivable presentment requirement; it failed to file a hearing request with the Secretary prior to filing its complaint and motion for temporary restraining order." (Doc. 26, at 11.) That is incorrect. Plaintiff's January 13, 2012 Request for Appeal unambiguously requests a hearing as to its contention that CMS's deficiency findings were erroneous. (Doc. 1, Exh. T, at 4.) At the time, plaintiff could not have filed a written request for a hearing as to the January 19, 2012 termination notice because CMS had not prepared it yet. Certainly, the matters on which the January 13 Request for Appeal did request a hearing encompassed many of the very same matters on which the Secretary's termination decision was grounded. Besides, GOS promptly

---

[21]     The Court recognizes that certain authorities have construed the "colorable" requirement as meaning that the constitutional claim itself must be colorable. *See, e.g., Cathedral Rock*, 223 F.3d at 364. No party defines the term "colorable" for purposes of this inquiry; however, numerous authorities in this and other contexts have deemed a claim colorable if it is not wholly insubstantial or frivolous. *See, e.g., Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (claim is not colorable "if it is immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous") (citations and internal quotation marks omitted); *Saleheen v. Holder*, 618 F.3d 957, 961 (8th Cir. 2010) ("A claim is not colorable if it is immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous.") (citation omitted); *Pareja v. Attorney General of U.S.*, 615 F.3d 180, 186 (3rd Cir. 2010) ("To determine whether a claim is colorable, we ask whether it is immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous.") (citation omitted); *Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir. 2008) (noting in § 405(g) context that "[a] constitutional claim is colorable if it is not wholly insubstantial, immaterial, or frivolous") (citations omitted); *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 923 (7th Cir. 2003) ("a colorable claim is merely one that is not frivolous"); *Davis v. Featherstone*, 97 F.3d 734, 737-38 (4th Cir. 1996) ("A claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits."); *Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp.2d 1, 5 (D.D.C. 1999) (in § 405(g) "completely collateral" context, finding that a constitutional claim is "colorable" for *Eldridge* purposes if it is not "wholly insubstantial, immaterial, or frivolous"). Notwithstanding the Court's determination *infra* that GOS's claims do not have a substantial likelihood of success on the merits, they appear to satisfy by a comfortable margin the minimal threshold of being "colorable" (*i.e.*, not wholly insubstantial, immaterial or frivolous) for purposes of the "entirely collateral" analysis under *Eldridge*.

-17-

filed another Request for Appeal on January 30, 2012, this time expressly referencing the termination notice that CMS had issued in the interim.  The Court cannot find based on the Government's skeletal contention on this point that the nonwaivable presentment requirement has not been satisfied.[22]

   For all of these reasons, the Court is persuaded that, under *Mathews v. Eldridge*, GOS has satisfied the "final decision" requirement of § 405(g) pursuant to the "entirely collateral" doctrine.  Plaintiff's procedural due process claim is entirely collateral to its substantive claim of entitlement, rests on the proposition that full relief cannot be obtained at a postdeprivation hearing, and raises at least a colorable claim of irreparable harm.  As such, the waivable administrative remedies prescribed by the Secretary are deemed exhausted.  In light of that finding, and the Court's determination that GOS has complied with the nonwaivable, presentment requirement, GOS is entitled to judicial review pursuant to the provisions of § 405(g), and there is federal jurisdiction over its claims.  The Government's objection that federal jurisdiction is lacking is therefore **overruled**.

## III.   Analysis of Plaintiff's Request for Preliminary Injunction on the Merits.

### A.   *The Rule 65 Framework.*

   To be eligible for a preliminary injunction under Rule 65, a movant must establish each of the following elements:  (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.  *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).  Preliminary injunctive relief "is an extraordinary and drastic remedy not to be

---

[22]    Insofar as the Secretary's position is that the § 405(g) presentment requirement obligates GOS to present its due process and *ultra vires* claims administratively (in addition to the substantive administrative appeals it has already brought), *Eldridge* shows otherwise.  Recall that in *Eldridge*, the claimant brought an administrative claim for benefits, and instituted a judicial action claiming a constitutional right to a pretermination hearing (which constitutional claim he <u>never</u> presented to the agency).  The *Eldridge* Court readily deemed the presentment requirement satisfied by the claimant's submission of his benefits claim to the agency, even though he did not present his constitutional claim to the agency.  *See Eldridge*, 424 U.S. at 330-31.  This is exactly the position in which GOS finds itself, so the presentment requirement is plainly satisfied under *Eldridge*.

granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  Both sides agree that these factors govern GOS's Motion.  (*See* doc. 26, at 14; doc. 34, at 13-27.)  In this case, the analysis need proceed no further than the "substantial likelihood of success on the merits" prerequisite.

### B.   Substantial Likelihood of Success on the Merits.

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success."  *United States v. Alabama*, 2011 WL 4863957, *5 (11th Cir. Oct. 14, 2011) (citation omitted).   Plaintiff contends that it has a substantial likelihood of success on the merits as to its procedural due process claim, its *ultra vires* claim that the Secretary cannot terminate the Provider Agreement in the absence of immediate jeopardy, and its *ultra vires* claim that the Secretary cannot terminate the Provider Agreement until administrative review concludes.  The Court will address each claim in turn.

### 1.   Procedural Due Process.

Again, the gravamen of GOS's procedural due process claim is that it has a constitutional right to an administrative hearing before the Secretary can terminate the Provider Agreement.

In the January 20 Order, the Court cited authority for the proposition that "[h]ealth care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs."  (Doc. 13, at 9-10 n.13.)[23]  Defendants have not disputed that authority or challenged its applicability here.  Instead, the Secretary appears to have assumed (at least for the sake of argument) that such a property interest exists.  The Court will do the same, for purposes of this analysis.  Accordingly, the Court assumes (without finding) that there is a substantial likelihood that GOS has a protected property interest in continued participation in the Medicare and Medicaid programs.  The question is what process the Constitution requires before GOS may be deprived of that property interest.  The parties agree that the three-part balancing test announced in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), governs the analysis of what procedural protections are due.

---

[23]     *See, e.g., Vencor Nursing*, 63 F. Supp.2d at 10 ("Health care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs.") (citation omitted).

Plaintiff's problem is that the overwhelming majority of authorities (including all or virtually all appellate decisions) to have addressed the issue have concluded that Medicare providers enjoy no constitutional right to a pre-termination hearing. *See, e.g., O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 784 n.17, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) ("The patients also argue that they are third-party beneficiaries of the provider agreement … and that this status somehow entitles them to more than [the provider] itself is entitled to – namely, a pretermination hearing."); *Oakland Medical Group, P.C. v. Secretary of Health and Human Services, Health Care Financing Admin.*, 298 F.3d 507, 511 (6th Cir. 2002) (holding that Medicare provider "does not have a due process right to a pre-termination hearing" where provider's need to be subsidized for care of Medicare patients is incidental to the purpose and design of the program, the risk of erroneous deprivation of provider status is quite manageable, and the Government has a strong interest in expediting provider-termination procedures based on the Secretary's primary responsibility for insuring safety and care of Medicare patients and its strong interest in minimizing expenses of administering Medicare program); *Cathedral Rock*, 223 F.3d at 365 ("Balancing the government's strong interest in an expeditious procedure against the provider's less significant interest and the relatively small risk of erroneous termination, … a provider's procedural due process rights are adequately protected by a post-termination hearing."); *Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) ("At least three circuits have held that health-care providers such as hospitals are not entitled to an evidentiary hearing before they are suspended from receiving Medicare reimbursements. … The rationale for these holdings is that the government's compelling interest in assuring safe health care for the public, as well as its interest in avoiding the extra costs of pre-deprivation hearings, outweighs the doctor's concededly strong interest in protecting his reputation and medical practice."); *Northlake Community Hospital v. United States*, 654 F.2d 1234, 1241-42 (7th Cir. 1981) ("Northlake's first claim, that due process requires a hearing prior to the termination of Medicare benefits, has been in a similar context rejected by the Supreme Court. … Under these [*Eldridge*] criteria, we believe that Medicare providers … cannot raise a colorable constitutional claim of entitlement to a pre-termination hearing."); *Geriatrics, Inc. v. Harris*, 640 F.2d 262, 265 (10th Cir. 1981) (finding "no statutory or constitutional requirement that a hearing be conducted prior to the cessation of benefits" for a Medicaid provider); *Town Court Nursing Center, Inc. v. Beal*, 586 F.2d 266, 278 (3rd Cir. 1978) ("In light of the various interests involved, and especially in light of

the extensive procedural safeguards already provided to facilities such as Town Court, we believe it clear that any interest Town Court might have in continued certification under the Medicare program is adequately protected by existing procedures. … *Eldridge* … makes it apparent that due process does not require that Town Court be given an evidentiary hearing and judicial review prior to the effective date of the Secretary's initial decision to terminate provider status under Medicare."); *Trade Around World of PA v. Shalala*, 145 F. Supp.2d 653, 665 (W.D. Pa. 2001) ("numerous courts … have concluded that a Medicare provider is not entitled to a hearing before termination").

The analysis set forth in these opinions is persuasive. First, the "private interest that will be affected by the official action" is simply not compelling. *Eldridge*, 424 U.S. at 335. As a Medicare provider, GOS's interest in continuing to participate in the program "is not particularly strong because the Medicare provider is not the intended beneficiary of the Medicare program," and indeed its interest in being subsidized under that program "is only incidental to the purpose and design of the [Medicare] program." *Cathedral Rock*, 223 F.3d at 365.

Second, "the risk of an erroneous deprivation of such interest," *Eldridge*, 424 U.S. at 335, is not particularly high given the extensive process that GOS has already received. As is well-documented in the record, there have been numerous site visits to Gordon Oaks by neutral inspectors retained by the Secretary for that purpose. GOS has received detailed written reports of every survey. GOS has received and participated in face-to-face pre-termination exit interviews with the inspectors themselves (attended by plaintiff's counsel, no less) after all or many surveys. And GOS has had extensive opportunities to submit written materials[24] and bring administrative appeals of deficiency findings (which by all appearances GOS did not pursue in earnest until the January 13 Request for Appeal, despite ongoing deficiency findings at each survey during the last six months). *See Cathedral Rock*, 223 F.3d at 365 (reciting existing procedural protections in place for Medicare providers). The point is that GOS has received

---

[24] By way of example, the record shows that Gordon Oaks provided the surveyors with extensive written materials and rebuttal on January 10, 2012, in response to information furnished by the surveyors at an exit interview on January 7, 2012. (Doc. 1, Exh. S.) This kind of back-and-forth and opportunity to be heard constitutes considerable procedural protection that GOS has already received and enjoyed, albeit without bringing about a modification of the Secretary's termination decision.

considerable process already, so much so that the additional layer of an administrative hearing does not appear to be a constitutional imperative to protect any (relatively weak) constitutional interest that GOS may have in continuing to receive Medicare provider payments.

And third, "the Government's interest," *Eldridge*, 424 U.S. at 335, in expeditious provider-termination procedures is quite strong.  The Secretary has an overriding interest in satisfying its statutory obligation to ensure the safety and adequate care of aged and infirm Medicare patients.  The Secretary also has a cognizable interest in minimizing Medicare administrative costs and in being able promptly to terminate providers that it deems to have been out of substantial compliance over a six-month survey cycle.  *See Cathedral Rock*, 223 F.3d at 365.  From the Secretary's perspective, GOS is a Medicare provider that has consistently, routinely been found to be not in substantial compliance with program requirements during each of numerous surveys conducted on-site between July 2011 and January 2012.  The deficiencies for which Gordon Oaks was tagged during these surveys were not isolated or infrequent, but were numerous and extensive, including multiple "immediate jeopardy" tags at certain points during the six-month survey period.  Given this evidence of "serious, systemic problems of long standing" (doc. 26, at 16) at Gordon Oaks, the Secretary's interest in safeguarding the health and care of Medicare patients looms large, indeed.

In light of both the considerable persuasive authorities finding no right to pre-termination hearing for Medicare providers and the undersigned's preliminary application of the *Eldridge* factors to this case, the Court is of the opinion that GOS has failed to meet its burden of showing that success is likely or probable on its procedural due process claim.

> ## 2.      Secretary's Authority to Terminate without "Immediate Jeopardy."

As noted, one of GOS's *ultra vires* claims is that the Secretary lacks statutory authority to terminate a provider agreement in the absence of a finding of immediate jeopardy.

In seeking to terminate GOS's Provider Agreement, the Secretary is acting pursuant to its own regulations, which provide in pertinent part as follows: "If a facility's deficiencies do not pose immediate jeopardy to residents' health or safety, and the facility is not in substantial compliance, CMS … may terminate the facility's provider agreement."  42 C.F.R. § 488.412(a); *see also* § 488.412(d) ("CMS terminates the provider agreement … if the facility is not in substantial compliance within 6 months of the last day of the survey."); § 488.456(b)(1)(i) ("CMS … may terminate a facility's provider agreement if a facility … [i]s not in substantial

compliance with the requirements of participation, regardless of whether or not immediate jeopardy is present").  Unquestionably, the Secretary's contemplated termination of GOS's Provider Agreement falls squarely within the terms of these regulations.

Moreover, these regulations do have a reasonable foundation in the text of the Medicare statute.  Most significantly, the Act provides that the Secretary "may refuse to renew or may terminate [a provider] agreement after the Secretary … has determined that the provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder."  42 U.S.C. § 1395cc(b)(2)(A).  Likewise, the statutory provision that GOS contends limits the remedy of termination only to circumstances of "immediate jeopardy" also states that "[n]othing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies."  42 U.S.C. § 1395i-3(h)(2)(A).  That language directly contradicts plaintiff's reliance on that subparagraph to argue that Congress _was_ trying to restrict the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies.

In its briefs, plaintiff sets forth its own analysis of the relevant statutory provisions that diverges widely from the regulations and largely overlooks the two statutory sections on which the Secretary relies.  Not surprisingly, GOS's view is that the Medicare statute restricts the Secretary's use of the termination remedy to circumstances where immediate jeopardy exists.[25] To be sure, GOS's arguments underscore a degree of ambiguity in the Medicare Act concerning the availability of the termination remedy outside the immediate jeopardy context.  But a showing of ambiguity does not entitle plaintiff to the statutory construction of his choosing, or authorize this Court to promulgate its own independent interpretation of the statute.  In that

---

[25]     The critical provision on which plaintiff relies reads that if the Secretary determines that a skilled nursing home's deficiencies "(i) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies …, or terminate the facility's participation under this subchapter and may provide, in addition, for one or more of the other remedies described in subparagraph (B); or (ii) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B)."  42 U.S.C. § 1395i-3(h)(2)(A).  Plaintiff contends that inclusion of the termination remedy in subsection (i) (which covers immediate jeopardy situations) and omission of it in subsection (ii) (which covers non-immediate jeopardy situations) effectively bars the Secretary from applying the termination remedy without an immediate jeopardy finding.

regard, GOS does not address the Secretary's regulations or acknowledge the deference to which they are entitled where, as here, there is ambiguity in the relevant statutory provisions and how they interact with each other. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If … the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.") (footnotes omitted); *see Quinchia v. U.S. Attorney General*, 552 F.3d 1255, 1258 (11th Cir. 2008) (under *Chevron* deference, federal courts defer to an agency's regulatory interpretation of the statute it administers if the interpretation is reasonable and does not contradict the clear intent of Congress). On their face, the Secretary's regulations are a reasonable construction of the ambiguous statutory provisions, and in no way contradict Congress's clear intent. Thus, *Chevron* deference would appear applicable and, if applicable, would be fatal to this *ultra vires* claim.

Nor does plaintiff's position negate the persuasive effect of the district court decisions rejecting this very challenge. *See, e.g., Beverly Health & Rehabilitation Services, Inc. v. Thompson*, 223 F. Supp.2d 73, 110 (D.D.C. 2002) ("the Secretary has the power under the statute to terminate a facility after determining that the provider has failed to comply substantially with the agreement or the applicable law and regulations. *See* 42 U.S.C. § 1395cc(b)(2)(A)."); *Lake County Rehabilitation Center, Inc. v. Shalala*, 854 F. Supp. 1329, 1340-41 (N.D. Ind. 1994) (concluding that "the statute should be interpreted as a guidepost for the Secretary rather than as a limit on her powers" and that the challenged provision "permits the Secretary to terminate a provider's agreement even in the absence of a finding of immediate jeopardy"); *Mediplex of Massachusetts, Inc. v. Shalala*, 39 F. Supp.2d 88, 97 (D. Mass. 1999) ("I find the *Lake County* analysis compelling."); *Northern Health Facilities, Inc. v. United States*, 39 F. Supp.2d 563, 575 (D. Md. 1998) ("it is clear that the Secretary has the statutory authority to terminate a facility's participation even absent a finding of immediate jeopardy, and the regulations which so state are consistent with the statutory provisions").

For these reasons, the Court concludes that plaintiff has not met its burden of showing that it is likely or probable that it will succeed on the merits on its *ultra vires* claim that the

Secretary lacks the statutory authority to terminate a provider agreement in the absence of a finding of immediate jeopardy.

### 3.      Secretary's Authority to Terminate during Administrative Review.

The third and final ground on which GOS predicates its Motion for Preliminary Injunction is its *ultra vires* claim that the Medicare statute precludes the Secretary from terminating a provider agreement during the pendency of the administrative hearing process. This claim is clearly presented in the Complaint. (*See* doc. 1, ¶¶ 96-97.) It is also squarely raised in the Rule 65 Motion as a basis for GOS's request for TRO and preliminary injunction. (*See* doc. 3, at 14.)

In this *ultra vires* claim, plaintiff relies on the following provision from the Medicare statute: "The remedies described in clauses (i), (ii)(IV), and (iii) of paragraph (2)(B) may be imposed during the pendency of any hearing." 42 U.S.C. § 1395i-3(h)(5). The enumerated remedies consist of denial of payment, collection of civil money penalties, and appointment of temporary management. Termination of a provider agreement is not listed among the remedies specified in § 1395i-3(h)(5). GOS contends that this omission bars the Secretary from terminating the Provider Agreement during the pendency of the administrative hearing proceeding that it has now initiated.

Plaintiff's position is substantially undermined by several considerations. First, even though § 1395i-3(h)(5) has been on the books for a quarter century, GOS cannot point to a single published or unpublished decision from any court anywhere interpreting it in the manner plaintiff champions. In other words, GOS is asking this Court to impose a statutory constraint on the Secretary's termination power that it appears no court has previously recognized. Second, contrary to plaintiff's argument, the statute itself is ambiguous. To be sure, § 1395i-3(h)(5) unequivocally states that the intermediate sanctions created by the Omnibus Budget Reconciliation Act of 1987's amendments to the Medicare statute (the "OBRA Amendments") may be imposed during the administrative hearing process. But it does not specify that <u>only</u> those intermediate sanctions may be imposed, nor does it expressly state that termination may <u>not</u> be imposed until the hearing process concludes. It is thus far from obvious that, as GOS

contends, "Congress made a clear policy choice not to include termination as a remedy that the Secretary may utilize *during the pendency of hearings*."  (Doc. 41, at 3.)[26]

Third, the statutory context of § 1395i-3(h)(5), both within that section and elsewhere in the Medicare statute, counsels strongly against GOS's interpretation that Congress intended to tie the Secretary's hands from terminating a provider agreement whenever the provider utters the magic words, "I appeal" at the administrative level.  As an initial matter, the sentence immediately preceding that on which GOS relies reads, "The remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies."  § 1395i-3(h)(5).  Thus, Congress explicitly was not attempting by this provision to hem the Secretary in, to narrow its discretion, to limit its

---

[26]     The Court is, of course, well aware of the interpretive canon *expressio unius est exclusio alterius*, on which GOS's argument rests.  "The principle of *expressio unius* simply says that when a legislature has enumerated a list or series of related items, the legislature intended to exclude similar items not specifically included in the list." *Christian Coalition of Florida, Inc. v. United States*, 662 F.3d 1182, 1193 (11th Cir. 2011) (citations omitted); *see also Florida Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1327 (11th Cir. 2001) (under *expressio unius* canon, "the expression of one thing implies the exclusion of another").  However, the Eleventh Circuit has stressed "the maxim's limited use" and has observed that "courts rarely rely solely on this canon of statutory construction because it is subject to so many exceptions." *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1209 n.5 (11th Cir. 1999); *see also United States v. Castro*, 837 F.2d 441, 442-43 (11th Cir. 1988) (characterizing *expressio unius* as merely a "general guide to statutory construction," that "has its limits and exceptions").  Indeed, the maxim "requires great caution in its application." *Castro*, 837 F.2d at 443 n.2.  In that regard, the appeals court has cited with approval a commentator's assessment that "it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds.  Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context." *Wilhelm Pudenz*, 177 F.3d at 1209 n.5 (citations omitted).  Thus, context is crucial to any application of *expressio unius est exclusion alterius*.  *See id.* ("this maxim is at best a description, after the fact, of what the court has discovered from context"); *Castro*, 837 F.2d at 443 (maxim does not apply when context is to the contrary).  This is not materially different than the general principle that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its policy." *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (citation omitted).  As discussed *infra*, the context of the subject statutory language weighs heavily against application of the *expressio unius* canon here.

remedies, or to foreclose or restrict utilization of the termination remedy that is conferred elsewhere in the Medicare statute.[27]

Another important aspect of context is that the OBRA Amendments (including § 1395i-3(h)) were fashioned with the legislative intent of expanding the remedies available to the Secretary. Prior to the creation of those new remedies, the Secretary's enforcement mechanism for noncompliant Medicare providers was confined to the binary option of terminating or not terminating the provider agreement, with such termination remedy having been created by § 1395cc(b)(2)(A). The OBRA Amendments greatly expanded the remedies available to the Secretary by creating intermediate sanctions, to-wit: denial of payment, imposition of civil money penalties, and appointment of temporary management. *See, e.g., Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp.2d 1, 8 (D.D.C. 1999) ("Prior to 1987 the only available remedies were outright termination or a blanket ban on reimbursement for care of newly admitted residents. … The 1987 legislation establishes categories of non-compliance and provides a number of possible remedies for HHS to choose from based on the severity of the alleged noncompliance."). Thus, a fair reading of § 1395i-3(h) is that it was designed to create these intermediate sanctions, without trammeling the termination remedy already available to the Secretary. "[T]he new version of the statute … giv[es] HHS a set of intermediate sanctions to choose from rather than the extreme choices of termination or no sanction. There is no indication in the legislative history that Congress wished to limit HHS's ability to terminate a persistently noncompliant facility. … In fact, the recurring theme emerging from the legislative history is that the new provisions would grant HHS remedial powers *in addition* to those already available." *Vencor*, 63 F. Supp.2d at 9; *see also Lake County*, 854 F. Supp. at 1340. Viewed through this prism, there was no need for § 1395i-3(h)(5) to mention termination in the list of sanctions that may be imposed during the hearing process because the purpose of that subsection was to develop and implement certain intermediate sanctions, not to elaborate on (much less impinge upon) a termination remedy previously extended to the Secretary.

---

[27]     As previously discussed, the termination remedy was created by 42 U.S.C. § 1395cc(b)(2)(A), which authorized the Secretary to "terminate [a provider] agreement after the Secretary … has determined that the provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder." *Id.* That termination remedy predates the OBRA Amendments, of which § 1395i-3(h)(5) is a part.

Also critical to the context analysis in this case is that GOS's proposed interpretation of § 1395i-3(h)(5) would yield a result that is both inconsistent with other aspects of the statute and nonsensical.  Significantly, plaintiff's reading of § 1395i-3(h)(5) would preclude the Secretary from <u>ever</u> terminating a provider agreement as long as an administrative appeal was pending, regardless of how severe and immediate the risks to the care and safety of aged and infirm Medicare patients at the facility might be.  Under that construction, a provider's mere invocation of its administrative appeal rights would necessarily condemn Medicare patients to continue residing and receiving care at a facility where the Secretary has made an initial determination that they are receiving substandard care (and perhaps even egregiously substandard care) until the conclusion of the appeals process, rendering the Secretary powerless to protect those persons during that process and elevating the procedural interests of Medicare providers (who are incidental beneficiaries of the statute) far above the health and safety interests of Medicare patients (who are the primary, designed and intended beneficiaries of the statute).

But this would make no sense.[28]  After all, elsewhere in § 1395i-3, Congress unequivocally states that "[i]t is the duty and responsibility of the Secretary to assure that requirements which govern the provision of care in skilled nursing facilities under this subchapter, and the enforcement of such requirements, are adequate to protect the health, safety,

---

[28] Despite its weaknesses in other respects, plaintiff's position has the virtue of being unwavering and unflinching.  Under plaintiff's reading of the statute, there can be no distinction between immediate jeopardy and other situations for purposes of this section.  Either way, the provider's initiation of the appeals process would block the Secretary from terminating the Medicare provider agreement.  GOS acknowledges (as it must) that its reading of § 1395i-3(h)(5) would forbid the Secretary from terminating a provider agreement even in the most dire of immediate jeopardy circumstances until such time as the administrative hearing process is concluded.  Plaintiff insists that this was a conscious, intentional "policy choice" by Congress, to forbid the Secretary from taking any stronger action beyond appointment of temporary management whilst the appeals process is underway.  (Doc. 41, at 6-7.)  On its face, appointing a temporary manager would be a woefully inadequate remedy to safeguard Medicare patients' basic care and safety in a host of scenarios.  Besides, this purported "policy choice" is contradicted by other statutory provisions.  It runs afoul of the responsibilities that Congress expressly imposed on the Secretary.  And it is not a clearly articulated policy choice in the text of the statute or the legislative history.  Surely, if Congress had intended to adopt the counterintuitive and frankly bizarre policy choices attributed to it by GOS, it would have offered a clear, plain statement of that intent, as contrasted with the weak and ambiguous statutory language on which GOS hangs its hat.

welfare, and rights of residents and to promote the effective and efficient use of public moneys." § 1395i-3(f)(1).  Why would Congress impose such a solemn duty on the Secretary to protect Medicare residents in one breath, only to deal a crippling blow to its ability to provide such protection in the next?  Similarly, § 1395i-3 includes stern admonitions that the Secretary must take immediate action (up to and including termination) in immediate jeopardy situations.  *See* § 1395i-3(h)(2)(A)(i), § 1395i-3(h)(4).  Why would Congress charge the Secretary with taking immediate action, up to and including termination, in those emergency situations, only to effectively nullify that authority elsewhere in the same subparagraph by the mere voicing of an appeal by the provider?  The canons of statutory construction counsel against interpreting the statute in this absurd manner.  *See, e.g., Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) ("Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion.") (citation omitted).

The bottom line is this:  "[T]he Secretary's responsibility for insuring the safety and care of elderly and disabled Medicare patients is of primary importance" in the Medicare statutory and regulatory scheme.  *Cathedral Rock*, 223 F.3d at 365 (citation omitted).  "It is ludicrous to believe that the legislature intended to permit the appeal procedures to act as a roadblock to the prompt removal of patients for their own protection and safety from substandard facilities." *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1085 (7th Cir. 1982).  Absent a much clearer explication of intent than is set forth in the shadowy and ambiguous text of § 1395i-3(h)(5), the undersigned will not impute such a "ludicrous" intent to Congress.  Based on the parties' briefs and the Court's own research, it appears that no court has ever construed § 1395i-3(h)(5) in the stifling, suffocating manner advocated by GOS.  The undersigned will not be the first, at least not at the preliminary injunction stage of this case.  Plaintiff has not met its burden of establishing a substantial likelihood of success as to this *ultra vires* cause of action.[29]

---

[29]      GOS's principal critique of the Secretary's position on the § 1395i-3(h)(5) issue is that there is no "indication of what the Government believes the words used by Congress in subsection (h)(5) actually mean."  (Doc. 41, at 1.)  But plaintiff reads the Secretary's brief too narrowly.  It is not the Secretary's position that the statute's recitation of intermediate sanctions that may be imposed during the pendency of a hearing is a sentence devoid of any meaning.  But it <u>is</u> the Secretary's position that this sentence of § 1395i-3(h)(5) must be read in context.  Again, the context of the OBRA Amendments was that Congress was engrafting a set of intermediate (Continued)

**IV.    Conclusion.**

Although the Court finds that there is subject-matter jurisdiction over this case under a "entirely collateral" analysis pursuant to *Mathews v. Eldridge*, GOS has not met its burden of showing a substantial likelihood of success on the merits as to any of the three grounds for relief advanced in its Rule 65 Motion.  With respect to the procedural due process claim, it is neither likely nor probable that a constitutional right to a pre-termination administrative hearing exists in this setting.  With respect to the *ultra vires* claims, it is neither likely nor probable that (i) the Medicare statute forbids the Secretary from terminating a provider agreement absent an "immediate jeopardy" finding, or (ii) the Medicare statute forbids the Secretary from terminating a provider agreement if the administrative hearing process is pending.  Absent a substantial likelihood of success on the merits as to any of these claims, plaintiff cannot meet its burden of establishing an entitlement to the extraordinary remedy of a preliminary injunction under Rule 65, Fed.R.Civ.P., regardless of how the other Rule 65 elements may play out.  *See generally Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) ("If Bloedorn is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements" under Rule 65); *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) ("when a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction").

For all of these reasons, it is **ordered** as follows:

1.      Plaintiff's Motion for Leave to Exceed Page Limit for Reply Brief (doc. 33) is **granted**;

---

sanctions onto a pre-existing statutory scheme that already authorized the Secretary to terminate the provider agreement of a Medicare provider that was not in substantial compliance with program requirements.  Section 1395i-3(h) created those intermediate sanctions, so it comes as no surprise that Congress couched subsection (5) in terms of those intermediate sanctions rather than the termination sanction found elsewhere in the statutory scheme.  As the Secretary's brief puts it, taken in context, the challenged subsection may naturally be read "as an explication of the Secretary's remedial authority established in the OBRA amendments rather than as creating, by implication, a limitation on the pre-existing termination power."  (Doc. 40, at 2.) Accordingly, plaintiff's objection that defendants would read subsection (5) as being meaningless is inaccurate.

2.      The Secretary's Motion to Dismiss (doc. 25) for lack of subject-matter jurisdiction is **denied**;

3.      Plaintiff's construed Motion for Preliminary Injunction (doc. 4) is **denied**;

4.      The Temporary Restraining Order (doc. 13) entered on January 20, 2012 is **dissolved** and is of no further force or effect; and

5.      Inasmuch as plaintiff's claims for permanent injunctive relief remain pending (such that there remains a live case or controversy between the parties, notwithstanding disposition of the Rule 65 Motion), defendants are **ordered** to file their respective answers to the Complaint on or before **February 24, 2012**.

DONE and ORDERED this 10th day of February, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE